# COURT OF OYER AND TERMINER,

STATE *v.* PEO.

*Murder—Self Defense—Proof of Guilt.*

The jury must be satisfied beyond a reasonable doubt of the prisoner's guilt before they can convict, notwithstanding a preponderance of evidence against him.

If the fatal stroke be with a deadly weapon provided beforehand to be used in the encounter, the homicide will be murder. All homicides with a deadly weapon are presumed in law to be malicious, and the burden of proof to the contrary lies on the accused.

Where one is suddenly assailed by another in such a manner as to endanger his life, or to do him some great bodily harm, if there be no other means of escape or protection, he may kill his assailant.

Where two persons are engaged in a fight and one of them endeavors to withdraw, and he cannot do so by reason of the hostile opposition of his adversary, he may take the life of such adversary to preserve his own, or protect his person from great bodily harm.

(*New Castle, September, 1889.*)

INDICTMENT for murder.

*John Biggs,* for the State.

*Austin Harrington,* for the prisoner.

COMEGYS, C. J., charging the jury:

*Gentlemen of the Jury:* The instructions prayed for by the Attorney General, and the prisoner's counsel, make it necessary that the Court should deliver to you a more formal charge than would

otherwise be made—although the testimony laid before you on each side discloses a case differing in its facts from any hitherto tried in this State. As I do not purpose going over the testimony in detail, it will be sufficient I think to say, with respect to it, that it shows a fight between the prisoner and the deceased at or about the corner of Front and Market streets in this city, which had its origin, either in words, or personal violence, or both, upon the sidewalk in front of the prisoner's store and peanut stand at the northeast corner where those streets intersect each other, or in the store itself. The one thing certain, as I think I may say, is that for some reason or other, which you may gather from the testimony on both sides, a fight took place between the deceased and the prisoner, which was begun by one or the other of the combatants—the State's witnesses or those who spoke to that point supporting the theory that the first assault was by the prisoner; while those for the defence, who speak of the beginning of the affray, say it commenced by the act of the deceased in violently seizing the prisoner by the throat in his store, after using a very opprobrious epithet about him. However, the fight began, it became a mutual combat, both of them participating in it—the State contending that the deceased was in no sense the aggressor, but that the prisoner was: while, on the other side, it is claimed that the first assailant was the deceased; and that throughout the prisoner was strictly on the defensive, endeavoring to avoid collision with his opponent, or to escape it after it ensued. The conflict of testimony on this point, as upon all others in this trial, I submit to you to decide upon, as it is not within the province of this Court to do so, or more than to instruct how you shall decide a conflict wherever it occurs. Where there is opposing testimony upon a material point in a cause, the jury must examine the proof carefully, and give credit to that which under all the circumstances seems to them entitled to the most weight. In doing this they take into consideration the number and character of the witnesses on both sides, their intelligence, apparent freedom from bias, or prejudice, their means of observation, and concurrence in statement;

and where there seems to be better reason to rely upon those of one side than the other, then there exists greater weight of testimony on the part of the former—preponderance of proof as it is called—and the jury should yield its credence to the testimony of that side. But it should always be kept in mind that this rule does not apply to all the aggregate of the testimony on both sides; for if it did, a person accused and on trial, might be convicted upon the weight of testimony alone, whereas this is never to be done; nothing being sufficient to warrant a conviction of a prisoner, but entire satisfaction on the part of the jury, beyond a reasonable doubt, that he is guilty. It must not be only that the weight of the proof is against the prisoner, but that it also so preponderates over, or outweighs that on his part, as to leave no reasonable doubt of his guilt of the crime imputed to him.

After this contest had commenced, the deceased and the prisoner got out into the street in the strife between them, and soon afterwards the deceased overcame the prisoner and threw him on the pavement of the street and on an iron gutter cover in it, with great violence, according to the prisoner's witnesses, or some of them, and held him down so firmly that, according to one of them, it took three or four men to take him away from the deceased. After they were separated, it was found that the deceased had received a mortal stab from the pick which the prisoner used at his store in his sale of dates, and which he had in his hand at the time the deceased was taken from off him. There seems no room for doubt that during the whole time of the affray ouside the prisoner's store, he had the pick in his hands; for he never got back into the store from the time the contest began until it ended where the parties fell, with the deceased on top of him. By the testimony of the prisoner's witnesses, it is stated, that the deceased was a large, powerful man, much the physical superior of the prisoner. By the testimony of the State's witnesses, speaking to the point, it would seem that the deceased from the first was rather in the character of a defender of his person from the attempts of the prisoner to stab

him with the pick, and that for such purpose, he kept backing away from him, but the prisoner's witnesses state the contrary of this, and say that the deceased was the assailant in the whole contest, and that the pick was used by the prisoner by pushing the deceased back with the butt of the handle, except, as Mr. Scott testifies after the deceased had repeatedly kicked the prisoner when he seemed to be endeavoring to avoid further contest by returning to his store, and only then he turned around and struck him with the pick on the head.

With this concise, and I hope sufficient reference to the facts testified to before you—for they are all fresh in your mind and need no rehersal by me, I shall proceed to point out to you the law in cases of homicide, and leave you to apply such of it as has relevancy to the facts which you may deem sufficiently proved, and thus make up your verdict. I shall treat of that law in the inverse order of the instructions prayed for by the Attorney General, because I think it is capable of greater simplicity of exposition, in this case, in that way.

Every killing by one man of another is homicide. It is criminal or not, according to circumstances. There are some homicides, which are justifiable, others excusable, and others which are neither, but are felonious and punishable according to their quality. With the justifiable homicides we have nothing to do in this case and therefore I shall say nothing about them. I shall deal with felonous homicides, and with those excusable on the ground of self-defence.

Felonious homicides are murder and manslaughter. They again are divided into such as are malicious and those which are not. Malice is of the very essence of murder, and therefore no homicide is murder unless it is committed maliciously; but manslaughters are not malicious crimes; and that only is what distinguishes them from murders. Originally only one class of murders was known to our law. But the Legislature by the Code of 1852, divided the crime of murder into two classes, describing one of

them and calling it murder of the first degree, and classing all others as murder of the second degree. Murder itself (which includes both degrees) is the unlawful and felonious killing by one man of another with malice aforethought—which means malice preconceived. That is engendered before the act done. If that malice be express, then the offence is murder of the first degree; if it be not express, but is implied by law from the nature of the act done, it is murder of the second degree. Express malice exists where one, with sedate and deliberate mind and formed design, kills another. This state of mind and purpose are usually shown by the deliberate selection and use of a deadly weapon knowing it to be such, a preconcerted hostile meeting whether in a regular duel, or street fight—mutually agreed upon, or notified and threatened by the prisoner, privily lying in wait, a previous quarrel or grudge, the preparation of poison, or other means of doing great bodily harm, or the like. Malice implied in law is an inference or conclusion of law upon the facts found by the jury, and among these the actual intention of the prisoner becomes an important fact; for though he may not have intended to take away life, or to do any personal harm, yet he may have been engaged in some other felonious or unlawful act from which the law raises the presumption of malice. As if one attempts to kill or maim A, and in the attempt by accident kills B, a dear friend, or child; or if in a riot or street fight, one of the parties accidentally kills a third person who interferred to part the combatants and preserve the peace—the law implies malice, and the slayer is guilty of murder. Other examples are given in the books; but it is sufficient to say, that all malicious homicides other than those committed with express malice aforethought, are murders of the second degree. The legal definition of malice is—that it is a general malignity and recklessness of the lives and persons of individuals which proceed from a heart void of a just sense of social duty and fatally bent on mischief. And wherever the fatal act is committed deliberately or without adequate provocation, the law presumes that it was done in malice; and it

behooves the prisoner to show from evidence, or by inference from the circumstances of the case, that the offence is of a mitigated character and does not amount to murder. I have already shown to you how express malice is shown; and have stated that implied malice appears otherwise.

Manslaughter, as I have said, is not a malicious crime. It usually grows out of a sudden contest, or affray, between parties mutually contending, and where one in the heat of blood slays his adversary. If the fatal stroke be with a deadly weapon, the homicide will be murder, if it appear that the slayer provided himself with it beforehand to be used in the encounter. All homicides with a deadly weapon, or an instrument likely to produce death are presumed in law to be malicious; to save them from that inference, the prisoner must make it appear to the satisfaction of the jury, that his possession of such weapon or instrument was not a preparatory one for the conflict.

The law of self-defence is this—that when one is suddenly assailed by another in such a manner as to endanger his life, or to do him some great bodily harm, and he cannot escape the fury of his assailant otherwise than by taking his life, he may kill him. But before he can do this, he must do all he can to escape from the fury of his assailant, and may never take his life, except in the last extremity and where no other means for his safety are available to him. And the same is true, where two persons are engaged in a fight and one of them endeavor to withdraw from it and do what he can for that purpose, and yet he cannot do so by reason of the hostile opposition of his adversary, and to continue it would result in death or great bodily harm to him, he may take the life of such adversary to preserve his own, or protect his person from such harm.

I have now given you, gentleman, all the law that we think will aid you in deciding this case; and in doing so have answered affirmatively the main points, or prayers, of the Attorney General. In fact there is in this case no controversy as to the law. With

respect to the defence suggested by the learned counsel for the prisoner, that there is ground for the theory that the deceased accidentally fell upon the prisoner's weapon, and was not struck by him with it, we think it only necessary to say—that we have heard no fact proved that points to such conclusion. But if such was proved, it cannot avail the prisoner unless he was at the time using it lawfully in self-defence: if used otherwise, it would be an unlawful use, and subject him to the penal consequences of manslaughter at least.

The case is now submitted to you, gentlemen, upon the law, as we have delivered it to you, and the facts related by the witnesses, and we have confidence you will well consider it, and that your verdict will be entirely satisfactory to your consciences. It remains but to add the instructions asked for by the prisoner's counsel—that the prisoner cannot be convicted of any crime, unless you are satisfied by the proof in the case, beyond a reasonable doubt, that he is guilty of it.

A word more—in all indictments for murder of the first degree, as that in this case is, the jury may convict of that crime, or of murder in the second degree, or of manslaughter, as the evidence may warrant a conviction of a particular offence. If it do not so warrant, they are bound to acquit entirely.

· Verdict, not guilty.